IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SABRINA M. PHILLIPS, | ) | CASE NO. 5:19-CV-01261 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |
| | ) | |

Plaintiff Sabrina Phillips ("Plaintiff" or "Phillips") challenges the final decision of Defendant Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED IN PART and REVERSED AND REMANDED IN PART for further proceedings consistent with this opinion.

## I.     PROCEDURAL HISTORY

In June 2015, Phillips filed an application for POD and DIB, alleging a disability onset date of April 26, 2013 and claiming she was disabled due to: colon rectal cancer, stage 3D; neuropathy in hands and feet; rectovaginal fistula; colostomy bag; memory issues; and sleep apnea. (Transcript ("Tr.") at 18, 204.) The application was denied initially and upon reconsideration, and Phillips requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 18.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

On February 13, 2018, an ALJ held a hearing, during which Phillips, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On June 19, 2018, the ALJ issued a written decision finding Plaintiff was not disabled before September 9, 2017 but became disabled on that date and has continued to be disabled through the date of the decision. (*Id.* at 18-26.) The ALJ's decision became final on April 4, 2019, when the Appeals Council declined further review. (*Id.* at 1-6.)

On June 1, 2019, Phillips filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 15, 18, 19.) Phillips asserts she "is only appealing the onset of disability, specifically that she was disabled prior to September 9, 2017." (Doc. No. 15 at 1.) Phillips raises the following legal issues:[2]

> (1) Is the Commissioner's decision contrary to law and not supported by substantial evidence where the ALJ and the Commissioner refused to find Ms. Phillips disabled prior to September 9, 2017, and there is substantial evidence of disability prior to September 9, 2017?
>
> (2) Is the Commissioner's decision contrary to law and not supported by substantial evidence where the Medical Expert ("ME") hired by the Social Security Administration ("SSA") stated that Phillips can never climb stairs, ramps, ladders, or scaffolds, she can never balance, stoop, kneel, crouch[,] or crawl, and the reason for these limitations is neuropathy of the feet (T. 891). The ME also stated that Phillips can never perform the activities of handling, fingering, feeling[,] or pushing/pulling, and the reason for this is neuropathy (T. 890). The ALJ refused to accept any of these limitations in the use of the hands and feet found and none of these appear in the RFC in the ALJ's decision.

---

[2] The Court notes the assignments of error raised in the "Legal Issues" portion of Phillips's brief do not precisely align with the assignments of error presented in the "Arguments" portion. Further, Phillips presents four distinct issues in the "Legal Issues" section, while only presenting three "argument sections" in the "Arguments" portion. In her reply brief, for the first time, Phillips cites in support of her substantial evidence argument just shy of three years of appointments Phillips had with her primary care physician, Dr. Erica Savage-Jeter. (Doc. No. 19 at 5.) Phillips failed to present any of this evidence in the facts section of her initial brief. (Doc. No. 15 at 3-4.) In fact, Phillips devoted a total of three *paragraphs* in the Facts section of the brief to summarize the medical evidence in this case. (*Id.*) The Court's initial order is clear that "[a]ny facts recited in support of the 'Argument' or 'Analysis' section of the brief must also be set forth in the 'Facts' section of the brief." (Doc. No. 5.) The Court warns counsel that failure to adhere to this Court's order regarding briefing risks the Court striking of part or all of the non-compliant brief.

(3)  Is the decision of the Commissioner and the Appeals Council contrary to law and not supported by substantial evidence where the Appeals Council states at Tr. 2 that they refused to consider or even mark as exhibits the records Plaintiff's counsel submitted from the South Carolina Vocational Rehabilitation Department ("SCVRD"), and the only reason they gave is these records would not change the outcome of the case.

(4)  Is the Commissioner's decision contrary to law and not supported by substantial evidence where the claim was denied by way of the ALJ's hypothetical question to the VE that did not contain all of Ms. Phillips['s] limitations?

(Doc. No. 15 at 2-3.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Phillips was born in June 1971 and was 46 years old at the time of her administrative hearing (Tr. 18, 179), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. § 404.1563(c). She has at least a high school education and is able to communicate in English. (Tr. 24.) She has past relevant work as a cashier and store laborer. (*Id.*)

### B.  Relevant Medical Evidence[3]

#### 1.  Pre-Hearing Evidence

On October 4, 2012, Phillips underwent a rectosigmoid colectomy and removal of a low grade (moderately differentiated) adenocarcinoma[4] and was diagnosed with colon cancer. (*Id.* at 837.) She received radiation therapy from December 10, 2012 to January 23, 2013. (*Id.* at 473.) She also received chemotherapy during that time, as well as from February 26, 2013 to August 6, 2013. (*Id.* at 476.) During this treatment, she developed some numbness and tingling in her hands and legs, as well as a

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. Further, the Court only addresses Phillips's physical limitations and impairments as Phillips does not challenge any of the mental findings made by SSA.

[4] "[C]arcinoma derived from glandular tissue or in which the tumor cells form recognizable glandular structures . . . . DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 26 (30th Ed. 2003). Carcinoma is "a malignant new growth made up of epithelial cells tending to infiltrate the surrounding tissues and give rise to metastases." *Id.* at 292.

pleural effusion and accompanying chest pain.  (*Id.* at 470.)  By April 22, 2013, her chest pain had gotten slightly better and there was no more pleurisy. (*Id.*)

From May 27 to May 29, 2013, Phillips was hospitalized for pneumonia.  (*Id.* at 587-88.) At a follow up oncology appointment with Dr. Yee the following week, Phillips reported that she was feeling "a whole lot better," her fever was gone, and her shortness of breath had improved.  (*Id.* at 472.)  Dr. Yee noted Phillips's peripheral neuropathy was improved with Neurontin.  (*Id.*)

On June 24, 2013, Phillips again saw Dr. Yee for an oncology follow up.  (*Id.* at 473.)  Phillips reported "mild" numbness and tingling in the bottoms of her feet as well as her fingertips, which was controlled by Neurontin.  (*Id.*)

On July 3, 2013, Phillips saw her primary care doctor Erica Savage-Jeter, M.D., for follow up from her hospitalization for pneumonia.  (*Id.* at 388.) Dr. Savage-Jeter noted Phillips had completed her antibiotics and returned to work.  (*Id.* at 389.)  Phillips told Dr. Savage-Jeter the Neurontin for her chemotherapy-induced neuropathy was "working well."  (*Id.*)

On September 12, 2013, Phillips saw Dr. Yee for a follow up appointment and complained of "significant neuropathy involving both of her lower extremities, as well as her hands."  (*Id.* at 476.)  Phillips reported she had difficulty walking for the past two weeks, was using a walker, and had not been able to go to work since August 6, 2013.  (*Id.*)  At this visit, Phillips told Dr. Yee her walking was better and she was no longer using the walker, but she still had "significant numbness and occasional pain" in both legs, as well as her hands.  (*Id.*)  The numbness and tingling went from her knees to the bottoms of her feet, and from her wrists to her hands.  (*Id.*)  On examination, Dr. Yee noted Phillips's gait was imbalanced and she had to hold onto the walls in order to walk.  (*Id.*)  Dr. Yee ordered Phillips to continue with Neurontin.  (*Id.*)   At this visit, Dr. Yee noted Phillips's CT scan of her chest, abdomen, and pelvis did not show any signs of metastatic disease.  (*Id.*)

On November 4, 2013, Phillips saw Dr. Savage-Jeter for a follow up appointment, medication concerns, and medication refills. (*Id.* at 384.) Phillips reported her neuropathy was worsening, and the Cymbalta prescribed by Dr. Yee in addition to the Neurontin improved it very little. (*Id.* at 386.) On examination, Dr. Savage-Jeter found Phillips's gait and station to be normal. (*Id.* at 387.)

On December 13, 2013, Phillips underwent multiple surgeries, including an ostomy reversal with a diverting loop ileostomy. (*Id.* at 313–14.) She experienced some post-operative complications but by a January 16, 2014 follow up visit was "doing well." (*Id.* at 313–14.)

On March 12, 2014, Phillips saw Dr. Yee for an oncology follow up. (*Id.* at 478.) Dr. Yee noted Phillips was awaiting further colostomy surgery, pending the resolution of a fistula. (*Id.*) While Phillips reported rectal pain related to the radiation, she told Dr. Yee she was doing "fairly well." (*Id.*) Dr. Yee noted Phillips's peripheral neuropathy was "improved." (*Id.*)

On May 6, 2014, Phillips saw Dr. Savage-Jeter for a follow-up appointment. (*Id.* at 511.) Phillips continued to await colostomy surgery. (*Id.* at 512.) Phillips reported her neuropathy was unchanged and was taking Neurontin. (*Id.*) On examination, Dr. Savage-Jeter found Phillips's gait and station to be normal. (*Id.* at 513.)

On August 26, 2014, shortly after surgery for a rectovaginal fistula, Phillips was hospitalized for abdominal pain and decreased ostomy output. (*Id.* at 363–64, 480.) Yet, she improved within days and was discharged. (Tr. 363– 64.) Indeed, by an early September oncology appointment, she was feeling "a whole lot better," and, aside from some operative soreness, had "no other major complaints." (Tr. 480.)

Phillips attended post-surgical follow up appointments in September and October 2014 with surgeon Dr. McFadden, who noted Phillips was doing well overall. (*Id.* at 307–10.)

On December 11, 2014, Phillips saw Dr. Yee for a follow up appointment. (*Id.* at 451.) Dr. Yee noted Phillips was doing "fairly well now" and her energy level was "slowly improving." (*Id.*) Phillips

reported the neuropathy in her legs was still bothering her, and she had difficulty walking because of it. (*Id.*) Dr. Yee's notes do not reflect any changes made to Phillips's medications at that time. (*Id.*)

On January 13, 2015, Phillips saw Dr. Savage-Jeter for a follow-up appointment and medication refills. (*Id.* at 373.) On examination, Dr. Savage-Jeter found Phillips's gait and station to be normal and normal movement of all extremities. (*Id.* at 376.) Dr. Savage-Jeter ordered Phillips to continue to take Neurontin for her neuropathy. (*Id.* at 377.)

On January 14, 2015, Phillips saw Dr. Puls for a surgical follow-up. (*Id.* at 365.) Dr. Puls noted Phillips "continues to do very well" and that he did not "see or feel anything on her exam that bothers me in the least." (*Id.* at 366.)

On February 27, 2015, Phillips saw J. Cart deBrux, Jr., M.D., regarding her ongoing fistula issue. (*Id.* at 319.) Dr. deBrux believed that additional surgery could potentially help and allow her to be "colostomy free." (*Id.*)

On April 8, 2015, Phillips saw Dr. Yee for a follow-up appointment and reported feeling a "whole lot better." (*Id.* at 454.) Phillips told Dr. Yee the swelling of her legs had improved with diuretics. (*Id.*) Dr. Yee noted Phillips' peripheral neuropathy was improved with Neurontin and ordered her to continue to take it for her symptoms. (*Id.*)

On July 8, 2015, Phillips again saw Dr. Yee for follow up. (*Id.* at 372.) Phillips had been doing well and "[e]xcept for fluid retention, she has no other major complaints." (*Id.*) Dr. Yee noted, "Her neuropathy in her legs seems to have gotten better. Her major concern is really the fluid retention." (*Id.*)

On August 24, 2015, Phillips saw Dr. Savage-Jeter for a follow-up appointment. (*Id.* at 429.) Phillips reported she was feeling better and her neuropathy was better also, although she experienced pain in her hands while working. (*Id.* at 430.) On examination, Dr. Savage-Jeter found Phillips had normal movement of all extremities. (*Id.* at 431.)

On January 14, 2016, Phillips saw Dr. Yee for a six-month oncology follow-up. (*Id.* at 456.) Phillips reported doing "fairly well," although she "still ha[d] significant neuropathy involving her feet." (*Id.*)

On February 11, 2016, Phillips saw Dr. Savage-Jeter after she fell, complaining of pain in her tail bone. (*Id.* at 487.) Phillips reported she was feeling better and her neuropathy was better also, although she experienced pain in her hands while working. (*Id.* at 488.) On examination, Dr. Savage-Jeter found Phillips was walking normally and had normal movement of all extremities. (*Id.* at 488-89.)

On February 17, 2016, Phillips saw Dr. McFadden for a surveillance colonoscopy. (*Id.* at 531.) Although she was doing well overall, Phillips requested he consider another attempt to repair her fistula. (*Id.*)

On August 28, 2017, Phillips saw Dr. Yee for a six-month follow-up. (*Id.* at 847.) Phillips reported pain in her buttocks that radiated to her legs. (*Id.*) Dr. Yee ordered Phillips to return in four weeks for blood work and imaging scans. (*Id.* at 848.)

On October 31, 2017, Phillips saw Dr. Yee for a follow-up visit after imaging. (*Id.* at 850.) Phillips reported increasing pain in her rectum. (*Id.*) Dr. Yee's impressions included the following statement: "Hypermetabolic activity noted in the left lower lung pulmonary nodule, most likely metastatic disease as well as in the right pleural-based nodular densities seen in the CT scan also noted to be hypermetabolic. Likewise, hypermetabolic activity noted on the anus." (*Id.* at 851.)

## 2. Post-Hearing Evidence

On April 25, 2018, the ALJ sent written interrogatories and Phillips's records to medical expert Dr. Janis Eiler for her professional opinion regarding Phillips's condition. (*Id.* at 878-81.) On May 1, 2018, Dr. Eiler opined, "The claimant's colorectal cancer is in all likelihood recurrent, based on imaging and the opionions of her treating physicians. She meets [Listing] 13.18A as of the earliest date the probable

metastases are noted. The earliest imaging demonstrating probable metastases in the information provided is the PET CT of 9/9/17. (16F p8)." (*Id.* at 886-87.)

Dr. Eiler also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). (*Id.* at 888-93.) Dr. Eiler opined Phillips could stand or walk for one hour at a time without interruption but could sit for eight hours in an eight-hour work day and stand and walk for four hours in an eight-hour work day. (*Id.* at 889.) Dr. Eiler further opined Phillips could occasionally reach in all directions, but never handle, finger, feel, push, or pull because of the neuropathy in her hands. (*Id.* at 890.) Dr. Eiler also opined Phillips could never climb stairs, ramps, ladders, or scaffolds and never balance, stoop, kneel, crouch, or crawl because of the neuropathy in her feet. (*Id.* at 891.) The form stated as follows: "The limitations above are assumed to be your opinion regarding current limitations only. However, if you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations, on what date were the limitations you found above first present?" (*Id.* at 893.) Dr. Eiler responded, "9/9/17 or earlier documentation, if any, of cancer recurrence." (*Id.*)

## C.    State Agency Reports

On December 16, 2015, state agency reviewing source Dina Nabors reviewed the medical records and opined Phillips had the residual functional capacity ("RFC") to perform sedentary work. (*Id.* at 72–75.) She opined Phillips could occasionally climb ramps and stairs, as well as stoop, kneel, crouch, and crawl. (*Id.* at 73.) She could never climb ladders, ropes, or scaffolds. (*Id.*) She could frequently balance. (*Id.*) Moreover, Phillips should avoid concentrated exposure to hazards, vibration, humidity, and temperature extremes. (*Id.*)

On June 8, 2016, state agency reviewing physician Thomas Thomson, M.D., reviewed the updated medical records and opined Phillips had the RFC to perform light work. (Tr. 90–93.) Dr. Thomson agreed Phillips could occasionally climb ramps and stairs, as well as stoop, kneel, crouch, and crawl. (*Id.*

at 91.)  She could never climb ladders, ropes, or scaffolds.  (*Id.*)  She could frequently balance.  (*Id.*)

However, Dr. Thomson believed Phillips did not have have any environmental limitations.  (*Id.* at 91.)

**D.  Hearing Testimony**

During the February 13, 2018 hearing, Phillips testified to the following:

- She lives alone, although her mother lives right next door.  (*Id.* at 42.)  Her mother comes over and takes care of her.  (*Id.*)

- She has a driver's license, but she rarely drives.  (*Id.*)  Her mother drives her to where she needs to go.  (*Id.* at 43.)

- She moved back to Ohio from South Carolina the previous April.  (*Id.* at 43.)

- The neuropathy began after her cancer treatment.  (*Id.* at 46.)  Although it varies, it feels like numbing, stinging, "icepick, electric cattle prod."  Some days it is painful, other days it is numb.  (*Id.*)  She gets the neuropathy in her fingertips, her toes, and her heels.  (*Id.* at 47.)  Since 2014, she has been unable to feel from her feet to her knees.  (*Id.* at 48.)  At one point she could not pick up a cup without dropping it. (*Id.*)  Some days she can hold a cup with both hands, and other days she uses a sippy cup.  (*Id.*)  She takes gabapentin and Cymbalta for the neuropathy.  (*Id.* at 49.)

- She used a cane at the hearing.  (*Id.* at 47.)  She has been using it since 2015.  (*Id.*)  She was prescribed a walker at one point and then went from the walker to the cane. (*Id.*)  She does not need her cane at home because she lives in a trailer and the walls are close together.  (*Id.* at 51-52.)

- Her shortness of breath started a few months ago.  (*Id.* at 47.)  Sometimes it is very bad, and sometimes it is not.  (*Id.*)

- She must alternate between standing and sitting because of the pain in her bottom from the surgeries, chemotherapy, and radiation.  (*Id.* at 49-50.)

- She quit smoking a year ago.  (*Id.* at 50.)

- A typical day for her consists of waking up around 7:00 a.m. and moving to a recliner in the living room that lays out almost into a bed.  (*Id.* at 51.)  Her mother gets her coffee, brings it over to her, and turns on her TV.  (*Id.*)  Her mother prepares her food.  (*Id.*)  She then watches TV until she falls asleep because of the gabapentin. (*Id.*)  She sleeps for a couple of hours, wakes up, and watches some more TV.  (*Id.*)  She may go to the bathroom or get something to drink, and then go lay down for a while because her legs and backside start to hurt if she sits in her chair too long.  (*Id.*)  She will lay in bed on her side for a few hours, then get up and go to the living room. (*Id.*)  She alternates between the bedroom and the living room all day.  (*Id.*)  If she

has a good day, she may walk without falling down or play on the computer. (*Id.* at 53.) This has been her level of functioning since 2014. (*Id.*)

- She occasionally goes to church and goes to the store once in a great while. (*Id.* at 52.) Her mother and sister do her cooking and cleaning. (*Id.* at 52-53.)

The VE testified Phillips had past work as a cashier and store laborer. (*Id.* at 58-59.) The ALJ then posed the following hypothetical question:

> The first hypothetical, assume a hypothetical individual of the claimant's age and education and with the past jobs you described. Further assume this individual is limited to a range of sedentary work with the following additional limitations: frequent handling and fingering bilaterally, occasional ramps and stairs, no ladders, ropes or scaffolds, occasional balance, stoop, kneel, crouch, no crawling, no unprotected heights, moving mechanical parts, no operating a motor vehicle, frequent exposure to vibration, and occasional exposure to dust, odors, fumes and pulmonary irritants, and extreme cold and extreme heat.

(*Id.* at 59.)

The VE testified the hypothetical individual would not be able to perform Phillips's past work as a cashier and store laborer. (*Id.*) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as document preparer, patcher, and touch-up screener. (*Id.* at 60.)

In the second hypothetical, the ALJ asked the VE to incorporate the same limitations as the first but add that the hypothetical person would need the use of a cane to ambulate and to stand. (*Id.*) The VE testified none of the three representative jobs identified required walking as an essential function, so if the hypothetical person was able, they could sit the entire time with those jobs. (*Id.*)

Phillips's attorney asked the VE if the limitations to handling and fingering were changed to occasional, whether the hypothetical person could perform the three jobs the VE identified. (*Id.* at 61.) The VE testified that hypothetical person would not be able to perform the three jobs he identified. (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists

in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 404.1520(g), 404.1560(c).

Here, Phillips was insured on her alleged disability onset date, April 26, 2013 and remained insured through December 31, 2019, her date last insured ("DLI.") (Tr. 18.) Therefore, in order to be entitled to POD and DIB, Phillips must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    Since the alleged onset date of disability, April 26, 2013, the claimant has had the following severe impairments: adenocarcinoma and rectovaginal fistula – status post multiple surgeries, chemo-induced peripheral neuropathy, and morbid obesity (20 CFR 404.1520(c)).

4.    Prior to September 9, 2017, the date the claimant became disabled, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that prior to September 9, 2017, the date the claimant became disabled, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she requires the use of a cane to ambulate and to stand; frequent handling and fingering bilaterally; never climbing ladders, ropes, and scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and crouching; never crawling; never working around unprotected heights, moving mechanical parts, or operating a motor vehicle; frequent exposure to vibration; and occasional exposure to dust, odors, fumes, pulmonary irritants, and extreme heat and cold.

6. Since April 26, 2013, the claimant has been unable to perform any past relevant work (20 CFR 404.1565).

7. Prior to the established disability onset date, the claimant was a younger individual age 18-44, and she subsequently changed her age category to a younger individual age 45-49 (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Prior to September 9, 2017, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. Beginning on September 9, 2017, the severity of the claimant's impairments has met the criteria of section 13.18 (A) of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 404.1525).

12. The claimant was not disabled prior to September 9, 2017, (20 CFR 404.1520(g)) but became disabled on that date and has continued to be disabled through the date of this decision. Her disability is expected to last twelve months past the onset date (20 CFR 404.1520(d)).

(Tr. 20-26.)

## V.    STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25

13

F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No.

11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    SCVRD Records and Additional Medical Evidence

Phillips "moves the Court to consider the following new and material evidence:" (1) evaluation summary from the SCVRD and (2) three operative reports from 2012. (Doc. No. 15 at 1-2.) Phillips further challenges "the decision of the Commissioner and the Appeals Council" in refusing "to consider or even mark as exhibits" the SCVRD records where the only reason given was these records would not change the outcome of the case. (*Id.* at 3.)

The Commissioner asserts that while Phillips "briefly invoke[s] sentence six" of 42 U.S.C. § 405(g), Phillips "neither cites the provision in her argument nor references its standards at any point, arguably waiving any sentence six argument." (Doc. No. 18 at 14.) And to the extent Phillips makes a sentence six argument, the Commissioner maintains its fails. (*Id.*) The Commissioner further responds that the Appeals Council's determination to deny review of the ALJ's decision is not subject to judicial review. (*Id.* at 13-14.)

In reply, Phillips cites *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992) for the proposition that "'where a party presents new evidence on appeal, this Court can remand for further consideration only where the party seeking remand shows the new evidence is material.'" (Doc. No. 19 at 2.)

First, the only decision reviewed by this Court where, as here, the Appeals Council denied review is that of the ALJ. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993)

("While new material evidence may be submitted for consideration to the appeals council pursuant to 20 C.F.R. § 404.970, on appeal we still review the ALJ's decision, not the denial of review by the appeals council.") (citing *Phelps v. Sec'y of Health & Human Servs.*, 961 F.2d 1578 (6th Cir. 1992)). The Sixth Circuit "has repeatedly held that evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Foster*, 279 F.3d at 357. However, a reviewing court can order remand of a case for consideration of additional evidence not before the ALJ pursuant to sentence six of 42 U.S.C. § 405(g). *Id.*

Sentence six of 42 U.S.C. § 405(g) permits a court to order a case remanded for consideration of additional evidence under certain circumstances. The Sixth Circuit has interpreted this statute as creating the following requirements for a remand to consider new evidence: that the evidence be "new"– that is, "not in existence or available to the claimant at the time of the administrative proceeding"; that the evidence be "material," which requires showing a "reasonable probability" that the Commissioner would have reached a different disposition of the claim if presented with the new evidence; and that "good cause" exists for not producing the evidence in a prior proceeding, which requires showing "a reasonable justification for the failure to acquire and present the evidence of inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357 (citations and internal quotations omitted).

The Sixth Circuit "has taken a harder line on the good cause test." *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986) (finding failure to satisfy good cause requirement where additional medical records were prepared after final decision and could not have been presented at hearing). "This requires more than just showing evidence did not exist at the time of the ALJ's decision, but rather a Plaintiff must 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Issac v. Comm'r of Soc. Sec.*, No. 1:16 CV 1345, 2017 WL 3705902, at *10 (N.D. Ohio Aug. 28, 2017) (citing and quoting *Oliver*, 804 F.2d at 966)).

While Phillips insists these additional records are "material," she fails to argue, let alone show, how the 2015 SVCRD records and 2012 operative reports are "new" under the Sixth Circuit's interpretation of sentence six of § 405(g) and that "good cause" exists for not presenting this evidence to the ALJ. (Doc. No. 15 at 9-10; Doc. No. 19 at 1-4.) The Court will not make these arguments for her. The burden of showing that a remand under sentence six is appropriate is on the claimant. *Foster*, 279 F.3d at 357. Phillips fails to meet that burden here. Therefore, a remand is not warranted under sentence six of 42 U.S.C. § 405(g).

**B.      Substantial Evidence of Disability Prior to September 9, 2017**

Phillips appears to argue the evidence supportive of a disability onset date before September 9, 2017 concerns her peripheral neuropathy.[5] Phillips asserts the medical evidence "showed beyond a doubt the existence of severe [chemotherapy-induced peripheral neuropathy] before September 9, 2017," (Doc. No. 19 at 5), and that her "severe peripheral neuropathy was clearly established by Dr. Yee's evaluation of September 9, 2013." (Doc. No. 15 at 8.) Phillips implies, although does not explicitly argue, the ALJ overlooked record evidence supporting Phillips's claims regarding the severity of her peripheral neuropathy and failed to explain his conclusion that Phillips's peripheral neuropathy was not disabling before September 9, 2017. (*See* Doc. No. 15 at 8; Doc. No. 19 at 4-5.)

The Commissioner argues the ALJ "reasonably considered the objective medical evidence" and "substantial evidence supports the RFC and the ALJ's decision." (Doc. No. 18 at 8.)

---

[5] Phillips's argument in her opening brief conflates several of her assignments of error in one section, making her substantial evidence argument less than clear. In a footnote, the Commissioner asserts Phillips waived "any arguments not raised in her brief, including any arguments about Plaintiff's alleged mental impairments; and any arguments mentioned only perfunctorily without argument," without identifying any specific argument that should be waived. (Doc. No. 18 at 8 n.4.) Later in his brief, the Commissioner specifically argues Phillips's Sentence Six argument should be waived. (*Id.* at 14.) As Phillips clarifies her general substantial evidence argument further in her reply brief and the Commissioner does not present any specific argument that it should be waived, the Court addresses her general substantial evidence challenge on the merits.

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 404.1527(d)(2).[6] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 404.1527(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004) (finding an ALJ need not discuss every piece of

---

[6] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Here, the ALJ devoted the following three paragraphs to Phillips's medical records:

> Despite the claimant's allegations, the medical evidence prior to September 9, 2017 is consistent with the residual functional capacity above. The claimant has a history of adenocarcinoma and rectovaginal fistula - status post multiple surgeries, chemo-induced peripheral neuropathy, and morbid obesity. In December of 2014, she presented to the Cancer Center of the Carolinas for a cancer follow up visit. Treating notes indicate that the claimant was doing fairly well, her energy level was slowly improving, and she was still experiencing difficulty with ambulating due to neuropathy, along with pain in both of her lower extremities.  A physical examination performed at this time revealed that the claimant had a functioning colostomy bag, there was no pedal edema, and her abdomen was flat, without any edema noted. Based on these findings, Dr. Yee diagnosed the claimant with stage IIIB rectosigmoid adenocarcinoma - status post low anterior resection on October 4, 2012 with a diverting colostomy following necrosis of the suture line, with the completion

of induction treatment and continuous radiation therapy from December 10, 2012 to January 23, 2013, followed by 12 cycles of Adjuvant, an exploratory laparotomy with primary closure of the rectovaginal fistula, and grade I peripheral neuropathy (Exhibit 6F, pg. 1).

Treating notes from the Cancer Center of the Carolinas taken in January of 2016 indicate that the claimant was doing fairly well at her six month cancer follow up visit. According to the claimant, she still had significant neuropathy involving her feet, and she was currently taking Neurontin for this issue. Upon physical examination at this time, the claimant had a flat and soft abdomen, her colostomy bag was functioning well, her liver was not palatable, and there was no palpable cervical or supraclavicular lymphadenopathy. Dr. Yee noted that a CT scan of the chest from January 7, 2016 showed no evidence of metastatic disease in the chest, while a CT scan of the abdomen and pelvis showed diffuse fatty liver, but there was no evidence of metastatic disease in the liver, retroperitoneal adenopathy, or pelvic mass or adenopathy, with postoperative changes noted in the pelvis (Exhibit 6F, pg. 6).

As noted above, the claimant also has a history of morbid obesity. Treating notes from the Family Medical Center taken in 2015 list the claimant's body mass index (BMI) at 41.3, consistent with morbid obesity (Exhibit 7F, pg. 8). As indicated in SSR 02-lp, obesity may have an adverse impact upon co-existing impairments. For example, someone with obesity and arthritis may have more pain and limitation than might be expected from arthritis alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day or equivalent schedule. The effects of obesity have been considered in this decision, when applicable, at each step of the sequential evaluation, and it has been concluded that, even with this consideration, the claimant was capable of performing a range of sedentary level work prior to meeting Listing 13.18 (A) on September 9, 2017.

(Tr. 22-23.)

For the following reasons, the Court finds the ALJ failed to meaningfully address the medical evidence regarding Phillips's peripheral neuropathy and build an accurate and logical bridge from the evidence to his conclusions. The ALJ mentions Phillips's neuropathy only twice in his RFC analysis, despite Phillips's consistent complaints to her treatment providers. (*See, e.g.,* Tr. 476, 488, 496, 505, 512, 516, 520, 523, 557, 650, 727-29.) The ALJ omits any reference to any evidence regarding Phillips's peripheral neuropathy and accompanying symptoms in her hands. While, as Phillips admits (Doc. No. 19 at 5), her neuropathy fluctuated and the evidence is mixed, the ALJ had a duty to weigh the conflicting

evidence and resolve any conflict. *Sayles v. Astrue*, No. 1:12CV0446, 2012 WL 5877417, at *8 (N.D. Ohio Nov. 20, 2012) ("The ALJ is charged with a duty to evaluate all of the medical opinions in the record and resolve any conflicts that might appear.") The Court cannot say the ALJ did so here. Furthermore, the evidence the ALJ does discuss in his RFC analysis supports Phillips's claims about the limiting effects of her peripheral neuropathy; therefore, the ALJ failed to build an accurate and logical bridge from the evidence he did discuss to his conclusion that Phillips had the RFC to frequently handle and finger, occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, and crouch. (Tr. 22.)

In sum, the ALJ's evaluation and discussion of the medical evidence is so deficient that it precludes meaningful appellate review. As noted *supra*, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877 (quoting *Sarchet,* 78 F.3d at 307). *See also Shrader,* 2012 WL 5383120, at *6 ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

In her opening brief, Phillips asserts she is "only appealing the onset of disability, specifically that she was disabled prior to September 9, 2017," maintaining she was disabled as of April 2013 or "at the latest July 2015." (Doc. No. 15 at 1.) In a footnote, the Commissioner responds that "Plaintiff cannot limit the scope of the Court's review under 42 U.S.C. § 405(g)" and – without citation to any authority – that "if remanded, the entire decision is subject to adjudication." (Doc. No. 18 at 2 n.2.) Therefore, "Plaintiff must accept the risk she takes in seeking judicial review and cannot cobble together different findings from different ALJ decisions." (*Id.*)

The fact remains "[t]he Commissioner does not cross-appeal from the ALJ's decision to partially award benefits" from September 9, 2017 on, based upon Phillips meeting Listing 13.18(A) as of that date. *See Dudek v. Comm'r of Soc. Sec.*, No. 2:17-cv-11045, 2018 WL 4609984, at **3, 7 (E.D. Mich. Aug. 24, 2018), *report and recommendation adopted by* 2018 WL 4600211 (E.D. Mich. Sep. 25, 2018). "Given the fact that" Phillips has "not 'appeal[ed] the award of benefits,'" but rather has appealed only the onset of disability, "and given the fact that the Commissioner did not appeal" the listing finding and award of benefits from September 9, 2017 onward, "*this portion* of the ALJ's decision should be **AFFIRMED** as unchallenged and should not be revisited on remand, the pivotal question being limited to whether an *earlier* onset date has been established." *Id.* at *7 (emphasis in original).

As this matter is being remanded for further proceedings concerning review and proper articulation of the record evidence and Phillips's RFC before September 9, 2017, and in the interests of judicial economy, the Court will not address Phillips's remaining assignments of error.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED IN PART and REVERSED AND REMANDED IN PART for further proceedings consistent with this opinion.

   **IT IS SO ORDERED.**


Date: March 10, 2020                         *s/ Jonathan Greenberg*
                                                      Jonathan D. Greenberg
                                                      United States Magistrate Judge